## MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* FERDINAND C. LATROBE et al., Trustees.

*Condemnation of Part of a Lot Subject to an Irredeemable Ground Rent—Apportionment of the Rent—Compensation of Owner of Reversion.*

When a part of a lot of ground, subject to a ground rent, is taken by eminent domain, the owner of the rent is entitled to compensation, although the remainder of the lot may be security for the payment of the rent.

When a material part of a lot of ground which is subject to an irredeemable ground rent is taken by eminent domain, so much of the rent should be extinguished as is in just proportion to the part of the lot taken, and the part not taken be made subject to the payment only of the remaining portion of the original rent.

But if the part of the lot condemned is so small in proportion to the whole as not to affect materially the value of the property, there will be no apportionment of the rent.

An irredeemable ground rent of $300 *per annum* was reserved on a lot of ground fronting 28 feet on a street and running back 123 feet. For the purpose of making a plaza the municipal authorities condemned the front part of the lot to a depth of 90 feet, leaving in the rear a lot with

a front of 28 feet and a depth of 33 feet. *Held*, that the rent should be apportioned, a proportionately smaller rent being made issuable out of the part of the lot not taken, and a sum of money being awarded to the owner of the ground rent for the diminution in the value of his rent.

Appeal from the Baltimore City Court (STOCKBRIDGE, J.)

The trial Court, sitting as a jury, found "that Ferdinand C. Latrobe *et al.*, trustees, owners of a ground rent on the lot described, to wit, a lot 28x123 will be damaged to the amount of $2,500 by being restricted to the collection of the same to a lot of 28x33; said amount being the damage on the market value of the said ground rent."

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Edgar Allan Poe* (with whom were *W. Cabell Bruce* and *Sylvan Hayes Lauchheimer* on the brief), for the Mayor and City Council of Baltimore.

By the Gluck case, it was decided that the landlord must rely upon the personal covenant in the lease, and that he was not entitled to any award, nor should the rent be apportioned. It, therefore, follows that, inasmuch as the personal covenant remained, and, in addition, the security was ample, there should have been awarded no damages to the reversioners. *Gluck* v. *Mayor and City Council of Baltimore*, 81 Md. 315. In *Baltimore* v. *Canton Company*, 63 Md. 218, it was held that the real purpose in creating ground rents was to enable the owner to derive an income from the land, and make a secure and permanent investment of its value in the land itself. The landlord is not affected by the rise or fall in the value of the fee; any enhancement in its value enures to the leasehold estate. The ground rent issuing therefrom remains fixed in amount, and the lessor is really interested in the subsequent value of the land and the erection of improvements thereon, only as furnishing a sufficient pledge or security for the sum certain to be annually paid to him.

As it was obvious from the testimony that the security was ample, it is respectfully submitted that the prayers of the

Mayor and City Council of Baltimore should have been granted.

*John N. Steele* (with whom was *John E. Semmes* on the brief), for Latrobe *et al.*, trustees.

The first prayer of the appellant asked the Court to rule, that as the undisputed evidence showed that the balance of the lot remaining was ample security for the rent of three hundred dollars, the owners of the rent were not entitled to recover any compensation. This prayer is manifestly bad, because it ignores entirely the evidence that the market value of the ground rent was decreased, by the taking of the front ninety feet, from a three per cent rent for a four per cent rent, and that it would thereby suffer a diminution in value of twenty-five hundred dollars. The question being whether the appellees suffered damage by reason of the taking of the front ninety feet, a prayer that fails to submit the question of damage, *vel non.* is bad.

It is equally obvious that when it is proved that the value of the rent has been decreased to the amount of twenty-five hundred dollars, it is no answer to say that the ground left is worth more than the market value of the rent, and that, therefore; no damage was suffered. The security of the rent is, it is true, a most important element in ascertaining its value, but the owner of a rent looks, and has the right to look not only to the security of his rent, but also to its market value, and while it may be that the portion of ground remaining might, upon entry thereon by the reversioners, ultimately sell for enough to pay them ten thousand dollars, the value of the rent capitalized at three per cent, yet they have been deprived by the act of the city of practically three-fourths of the security they formerly had for their rent, and the market value of their rent has been seriously impaired.

The appellees' prayer proceeded upon the theory upon which the Burnt District Commission made its award. That is, that the rent should be apportioned, and that, since only sixty dollars of the ground rent was kept alive, the appellees

were entitled to an award for the two hundred and forty dollars of the rent extinguished. In rejecting this prayer the learned Judge below considered the case of *Gluck* v. *M. & C. C. of Baltimore*, 81 Md. 315, conclusive.

The Gluck case only decided:

(1) That a taking by eminent domain is not an eviction.

(2) That a tenant under an ordinary lease remains liable to pay the whole of the rent, although a part of the property was taken.

(3) And that this taking constitutes an appreciable injury, for which he is entitled to compensation.

The rights of the landlord were not before the Court and were only considered incidentally. It is not proposed to ask Court to qualify its decision in this case, but it is submitted that the language used by the Court had reference to leases for short terms, and was not intended to apply to irredeemable leases for ninety-nine years, renewable forever.

The qualities or incidents of, and the principles of law applicable to, the two kinds of leases are widely different.

It is well settled that a ground rent is a rent service, and, therefore, if the lessor accept a surrender of part of the entire lot, or recover a part of the land in an action of waste or enter for a forfeiture in part, the rent shall be apportioned— that is, the rent shall be abated as to the part surrendered, forfeited or entered upon, and the balance shall remain upon the balance of the property. *Ehrman* v. *Mayer*, 57 Md. 612, 621, 622; *Worthington* v. *Cooke*, 56 Md. 51.

The chief difference between a ground rent and an ordinary lease is that the former is perpetual and that the lessee acquires substantially an absolute estate, subject only to the usual covenants to pay the rent reserved, taxes and assessments. *Banks* v. *Haskie*, 45 Md. 217; *Kopp* v. *Herman*, 82 Md. 339.

The system of ground rents, as known in Maryland, exists, so far as can be ascertained, only in one other State, Pennsylvania, and there only to a limited extent. It is submitted, therefore, that the authorities of the Courts of that State, in

which the question of the apportionment of ground rents was concerned, should have more weight than cases which deal simply with an ordinary lease. The only cases we have been able to find where the condemnation was of a permanent or perpetual lease, are *Cuthbert* v. *Kuhn*, 3 Whart. 357, and *Workman* v. *Mifflin*, 6 Casey, 369.

It would seem a fair inference that, in the Mifflin case, if the owner of the ground rent had been awarded a suitable portion of the damages, the Court would have held that the rent to that extent was extinguished.

It must be borne in mind that in the present case the Burnt District Commission awarded compensation, not only to the tenant, but also to the owner of the ground rent, so that both interests, or the whole estate in the lot taken, were compensated by the award of the commission, and there is, therefore, no injustice or hardship in holding that the ground rent to that extent was abated. If the contrary view be adopted by this Court, much hardship may, and many complications must necessarily, result.

*John Hinkley* and *Charles F. Carusi* filed a brief for J. A. Whitcomb, owner of the leasehold in this case.

BOYD, J., delivered the opinion of the Court.

There are two appeals in this record—the one being by the *Mayor and City Council of Baltimore* v. *Ferdinand C. Latrobe et al.*, *Trustees*, and the other a cross-appeal by those trustees from the rulings of the Baltimore City Court. Under and by virtue of an ordinance of the Mayor and City Council of Baltimore, passed in pursuance of an Act of the General Assembly of Maryland, being ch. 87 of the Laws of 1904, what is known as "The Burnt District Commission" was authorized to acquire for the Mayor and City Council of Baltimore, by various methods named in the Act, including that by condemnation, the necessary property for the purposes mentioned —one being to open public squares. Provision is made for notice to those assessed for benefits or to whom damages are

awarded in the condemnation proceedings, and the right of appeal to the Baltimore City Court is given, where the right of a jury trial is secured, and "the damages and benefits assessed by the commission to the appellant shall be open for review and correction by the said City Court." The statute further provides for an appeal to this Court. Amongst other improvements proposed is a plaza along St. Paul street from Lexington to Fayette streets. Included in that territory is a lot fronting 28 feet on St. Paul street, and having a depth of 123 feet, in which the trustees have an irredeemable ground rent of $300 per annum, which we understand from the statements of counsel to be for 99 years, renewable forever, on the terms usual in such leases in the city of Baltimore and elsewhere in this State, although we do not find it so stated in the record. The Burnt District Commission condemned 28x90 feet of that lot, leaving in the rear of it 28x33 feet. It awarded to the trustees the sum of $8,000 and provided that the ground rent be reduced to the extent of $240, leaving a rent of $60 per annum on the portion of the lot not taken. The city took an appeal and the case was submitted to the Court, without the intervention of a jury, and it found that the trustees, as owners of the ground rent, were damaged to the amount of $2,500 by being restricted to the collection of the rent to the lot of 28x33 feet—that amount being the damage to the market value of their ground rent. The city offered three prayers and the trustees one. The *first* of the city asked the Court to declare that as the undisputed evidence shows that the lot of 28x33 feet is ample security for the $300 ground rent, the trustees are not entitled to recover any compensation. The *second* asked it to declare that the $300 rent continues upon the lot 28x33 feet and the owners were not entitled to compensation, and the *third* that if the Court, sitting as a jury, should find that the rent of $300 is fully secured by the lot of 28x33 feet, the trustees are not entitled to any compensation. That of the trustees asked the Court to say that in estimating the damages to them the Court, sitting as a jury, was to bear in mind that the ground rent would be reduced

from $300 to $60, and that the rent of $60 would be confined to the portion of the lot not taken by the city.    The Court rejected all of the prayers and each party entered an appeal to this Court.

The record does not show whether the interest of the owner of the leasehold was included in the same proceeding as this, as would seem to be proper in order that their respective rights should be properly determined and adjusted, but since the argument a petition was filed in this Court by James A. Whitcomb, which alleges he is the owner of the leasehold interest and asks the privilege of filing a brief.    From what is stated in that petition we infer that the proceeding was against the trustees and the owner of the leasehold interest.    The latter took an appeal from the award of the commission to the Baltimore City Court, and then removed it to the Circuit Court of the United States for the District of Maryland.    According to the allegations of the petition, an appeal has been taken by the Mayor and City Council of Baltimore from the action of that Court to the United States Circuit Court of Appeals, which is still pending.

It is stated in the bills of exception that the evidence introduced in the lower Court tended to prove, amongst other things, that the value of the ground rent on the entire lot was ascertained by capitalizing the $300 at 3 *per centum* ($10,000) and that the value of the ground rent ($300) on the 28x33 feet could be ascertained by capitalizing it at 4 *per centum* ($7,500), thus lessening the market value to the amount of $2,500, and that the value of the remaining lot after the plaza is constructed will be $15,000.    As indicated by our reference to the prayers, the contention of the city is that the owners of the ground rent are not entitled to any damages, because the remaining lot fully secures their rent, and that on the part of the trustees is that the award of the Burnt District Commission followed the correct way of compensating them.    The contention of the city that no damages can be allowed because the rent is amply secured by the portion of the lot not taken cannot be sustained.    Passing for the present the question

whether, when part of a lot is taken under the power of eminent domain, on which there is a ground rent, there can be an apportionment or abatement of the rent, we cannot understand how it can be said that the owner of the ground rent is not injured by taking nearly three-fourths of the lot included in the lease.  It cannot be denied that it is private property which cannot be taken for public use "without just compensation, as agreed upon between the parties, or awarded by a jury being first paid or tendered," to use the language of sec. 40 of Art. 3 of our Constitution.  The city so recognized it by the condemnation proceedings.  It may be true, and the evidence tends to so show, that the portion of the lot not taken is sufficient to secure the $300 per annum, but that is not the question.  It is possible that conditions may at sometime exist that will materially lessen the value of the remaining lot, and make it worth less than $15,000, but, if there be no danger of that, the evidence tends to prove that it is now what is called a three *per centum* ground rent—that is to say, by reason of the security which the lot in its entirety affords, it is worth in the market $10,000—while it will only be a four *per centum* ground rent after the portion condemned is taken, which is only worth $7,500.  The record, which is very meagre, does not show when the lease was made, but prior to the enactment of the statute prohibiting them, irredeemable ground rents were permitted in this State, and, as this is said to be one, the lease must have been executed before the statute referred to.  The parties then had the right to agree upon the amount of rent to be reserved, and the quantity of land to be included, and upon what principle can the city of Baltimore, or any other corporation authorized to exercise the right of eminent domain, say that nearly three-fouths of the land included in such a lease by the contract of the parties can be taken without any compensation to one of the contracting parties?  It might under some circumstances be very small, or the benefits authorized to be assessed might be equal to the damages awarded, but surely it cannot be said that an owner of an interest in land who can obtain $10,000 for it is not en-

titled to any compensation when it is shown that his interest will only be worth $7,500 after the public takes what it wants. In *Mayor, etc., of Baltimore* v. *Rice*, 73 Md. 307, this Court had under consideration the question of compensation to a lessee, whose lease was only for a year at a time, in a proceeding relative to the opening of a street.  It was there said "In this State no man's property can be taken for public use before he is paid the value of it. The evidence tended to show that Rice's brick yard, though held by a precarious tenure, had a large market value.  A thing is worth what it can be sold for.  *  *  *  It is not a question of the permanency of his title to real estate, but of the saleable value of such interest as he had."  We cannot close our eyes to the fact, which is frequently before us, that ground rents, especially in Baltimore City, are constantly being sold and have market values (resembling somewhat those of bonds and stocks), depending upon the manner in which they are secured and the length of time they are to continue.  As under our system the taxes are paid by the owner of the leasehold interest, when well secured they are in demand and frequently realize prices far beyond what they could have been capitalized at when the leases were originally made.  We do not doubt the correctness of the rulings of the Court in rejecting the prayers offered by the city.

The remaining, and we must confess somewhat difficult, question is, what rule shall prevail in this State, where the system of ground rents is peculiar, when a portion of a lot subject to an irredeemable ground rent, renewable forever, is taken under the power of eminent domain ?  When the entire lot included in the lease is taken the question is one of comparatively easy solution, but when, as in this case, only a portion is condemned many difficulties are suggested, and it is not easy to adopt a general rule that will always do full justice to the condemning party, the owner of the fee and the leaseholder.  The condemning party, as a rule, ought not to be required to pay for *the two* interests more than the portion taken would be worth if owned by one person.  It is said in

*Lewis on Eminent Domain* (2nd ed.), sec. 483: "When there are different interests or estates in the property, the proper course is to ascertain the entire compensation as though the property belonged to one person, and then apportion this sum among the different parties according to their respective rights" In *Gluck* v. *Baltimore*, 81 Md. 320, this Court, through JUDGE McSHERRY, said "The owner of the leasehold, and the owner of the reversion, together hold the fee-simple estate. Each has a distinct estate or property. 'The interest of a termor, in the eye of the law, is just as potential as that of the owner of the fee, although in fact it may not practically be so valuable. *B. & O. R. R.* v. *Thompson,* 10 Md. 87,'" and after stating that such interests are protected by Art. 3, sec. 40, of the State Constitution, JUDGE McSHERRY added, "Whatever be the method of ascertaining the values of these distinct interests, it is evident that the sum of those values must be the full value of the property taken." The method of determining the amount which the condemning party *ought, as a general rule,* to be required to pay is therefore quite well settled, although there may be exceptions to that rule as indicated below, but whether the general rule applies or not the question still remains, how are the damages to be apportioned between the reversionary and leasehold interests? In considering that it may not be out of place, before citing authorities on the subject, to endeavor to ascertain the practical results from the several methods adopted.

If the whole lot is worth $60,000, and the part left is worth $15,000, *prima facie* that taken should be valued at $45,000; as the damage to the two interests, but still the inquiry is, how much to each? If the method adopted by the Court below is followed, the reversioner would be entitled to $2,500, plus the whole rent on the remaining lot, and the leaseholder to $42,500 of that fund, and if the remaining lot is worth $15,000, and there is a four *per centum* ground rent on it for the whole rent ($300), then each of them would have a value of $7,500 in that—thus making the leaseholder's interest in the whole, including the damages paid him,

$50,000 and the reversioner's interest $10,000. If on the other hand the reversioner is paid $8,000 out of the $45,000, there would be left for the leaseholder $37,000, and as his rent would be reduced from $300 to $60, if the latter be capitalized at 3 *per centum* ($2,000), the lease-holder would have an interest in the remaining lot worth $13,000, which added to the damages received by him would be $50,000—the same that he would have by the other method, the only difference being that by the first method he would receive more cash, and by the latter have a larger interest in the remaining lot.

We do not overlook the fact that although the reversioner's interest may be worth $10,000, the capitalization at 3 *per centum* in the market, still the leaseholder might say that he could sell his interest on a basis that would allow a capitaliza-tion of the rent at the rate of 4 *per centum*, for example, and hence the leasehold in the whole lot would be worth $52,500, instead of only $50,000. But it is impossible to provide by a general rule for all contingencies in such cases, and after all it is for the jury to determine what their respective interests are worth; and we are therefore of the opinion that owing to the peculiar character of this class of property, if it be proven that the reversioner's interest was worth $10,000 and the lease-holder's $52,500, the latter sum could be allowed, although the whole property,if no ground rent had been on it,would only have been worth $60,000. We say that because each is entitled under the Constitution to be compensated in damages for the amount of his interest taken, and if it be true that the values of the two interests are more than what the lots would be worth, if owned by one person, the necessities of the case require an apparent exception to the general rule announced above, as to what the condemning party must pay. It was said in Gluck's case that "the owner of each separate interest has the consti-tutional right to be fully compensated before his estate can be lawfully taken for a public use," and as the two interests are not only distinct, but may be somewhat conflicting in a case of this character, we must, in order to do justice to both and

to comply with the requirements of the Constitution, recognize an exception to the general rule. Indeed when a piece of property which is subject to an ordinary lease for a short term is taken, it may happen that although the owner of the fee is allowed full value for the property, the tenant must also be paid a large and substantial amount in addition, by reason of the value of his lease. But the jury, or other tribunal authorized to make the award, should always keep the value of the entire property in mind, and should limit the whole amount to be paid to that value, unless it is clearly shown that the lessee is entitled to more than the difference between what they allow the reversioner and what the whole property would be worth in the market, if there had been no ground rent.

The reversioner is undoubtedly entitled to what his interest is worth in the market and *prima facie* the leasehold is charged with that value. Of course we are aware that the market value may vary according to the conditions of the money market and other circumstances, but so will the leasehold interest vary and the jury must be governed by the values of each, at the time. We have seen that the leaseholder practically gets the same compensation whether the one or the other of the two methods above-mentioned be adopted, but it is manifest that this may not be so with the reversioner, or possibly with others. If all but a few feet, or a few inches, of a lot be taken (not being enough to secure the whole rent), while the compensation in cash allowed might be correspondingly increased over what he is allowed when the remainder of the lot is sufficient to secure the ground rent, still placing the whole of the rent on the part not taken might work great injustice. In the first place the original lessee would still be liable for the rent under his covenant in the lease, notwithstanding he has assigned it, for the owner of the fee can proceed against the original lessee by virtue of his covenant, or against the present holder of the lease by reason of his privity of estate. *Hintze* v. *Thomas*, 7 Md. 346, and many other cases so deciding. As irredeemable ground rents were not prohibited in this State until 1884, it is readily seen that

there may still be a great many persons living, who entered into covenants to pay the rent in such leases made prior to that time, and indeed there may be many lessees who entered into covenants in leases made since that date who have assigned them but could only relieve themselves of the covenant to pay by redeeming the rent under the Acts of 1884, 1888 or 1900 (according to the dates of leases), now codified in Code of 1904, Art. 53, sec. 24.

If the original lessee be dead, or financially irresponsible, and the lease be assigned to some one from whom the rent cannot be made, the reversioner cannot recover, and, if the remainder of the property be insufficient, he would in many cases be without any effective remedy, and yet it might in some cases affect the amount he would receive out of the damages allowed, if such a rent is still to be retained by him. If it does not so affect it then the leaseholder might suffer, for the amount paid to the reversionor might be considered in allowing compensation to the leaseholder, and he would still be liable for the whole rent as long as there was privity of estate, if he was an assignee, or as long as he was financially responsible, if he was the original lessee. It would seem therefore that the more equitable method would be to apportion or abate the rent, if that can be done, and hence we will now determine that precise question.

It was said at the argument that the case of *Gluck* v. *Baltimore, supra*, was thought by the lower Court to settle it, and it is so contended by the City Solicitor, as well as by the counsel for the leaseholder in the brief filed by him. It must be conceded that that case does give considerable ground for that contention, but when it is limited, as all decisions must be, to the facts and conditions shown to there exist, it is by no means conclusive of what is now before us. Gluck was the owner of a leasehold interest, under a lease executed on April 14th, 1885, for twenty years, *which was not renewable*. When it was heard in this Court ten years of the term had expired, and the intention of the parties is very clearly indicated by the terms of the lease that the lessee's interest should cease at the

end of the term, and it was provided that a building to be erected by the tenant should become the property of the lessor at that time.   The tenant was even prohibited from assigning or sub-letting the premises without the consent in writing of the lessor.   The rent reserved was $1,000 per annum payable monthly.   When therefore the city of Baltimore took the front part of the premises, including a portion of the building and an elevator, it was an easy matter to determine the loss to the tenant for the ten or eleven years he still had the right to the property and the damages sustained by him to the buildings, and the injury to the fee could be determined without difficulty. The latter belonged to the lessor, and at the expiration of the lease he was to get the property back, diminished by what the city took.   He was the substantial owner and the lessee only had an interest until the end of his term (1905).   But in the case of an irredeemable ground rent, such as this, where the owner of the fee only has an interest of $300 per annum in rent, and such covenants as are contained in the lease, which are usually to pay the rent, taxes, etc., the owner of the lease-hold interest is the substantial owner of the property. In *Holland* v. *Baltimore*, 11 Md. 186, it was held that the reversioner of a 99 year lease, renewable forever, was not even such owner or proprietor as was authorized to sign a petition to have a street paved, but the leaseholder of such a lease was the party who must sign for the lot so leased.   Any enhancement in value enures to the benefit of the latter.   He, his personal representatives and assigns, have a *perpetual* interest in the property, which can only be affected by a failure to pay the rent or comply with some covenant, and are entitled to a renewal at the expiration of every ninety-nine years, on payment of a small renewal fine.   Much of the most valuable property in the city of Baltimore is subject to such leases, and in some instances they have proved to be a serious injury to property, and a consequent detriment to the city, so much so that the Legislature beginning in 1884 has passed statutes providing that leases for more than fifteen years can be redeemed on the terms mentioned in the statutes.   In no other State in this

country has the system been adopted to such an extent as it is here, unless possibly in Pennsylvania.   Although we and our predecessors have from time to time applied many of the same principles to such leases as are applicable to short leases, no such question as that now before us has been passed on by this Court when such a lease was involved.

The expressions used in the Gluck case (on page 322 of 81 Md.), so much relied on in this, were quoted from *Dyer* v. *Wightman*, 66 Pa. St. 427, where the Court was considering an ordinary lease for five years, and hence one of the character before us in Gluck's case.   It was there said that "nothing but a surrender, a release or an eviction can, in whole or in part, absolve the tenant from the obligation of his covenant to pay rent, *Fisher* v. *Millikin*, 8 Barr. 111;" that it still remained, if the premises were wrongfully entered by a disseizor and the tenant disposed for his entire term, even by a military force of a public enemy, or if the premises were destroyed or rendered untenantable by fire, floods, etc., and that it was also settled that by a taking under the right of eminent domain was not an eviction.   *Dyer* v. *Wightman* was an action of debt for two year's rent.   A Mrs. Smith had leased a lot to Dyer who rented a part to Wightman.   A railroad company condemned the whole of the lot and the viewers awarded Mrs. Smith $10,000.   The report of the case does not distinctly show what, if anything, was awarded to Dyer, the lessee of Mrs. Smith and lessor of Wightman, but the reasoning of the Court would seem to indicate that something was.   The Court (SHARSWOOD, J.), said that conceding that *at law* the tenant would still be liable for the rent, *in equity* he would not be and, as all Courts in Pennsylvania proceed upon principles of equity, the plaintiff could not recover.   It was said that a tenant would be entitled to be indemnified against the rents payable during his term—that if they are deducted from the damages allowed the lessor, and paid to the lessee, *in equity* that money belonged to the lessor, and it would be decreed to be paid to him; that "The damages awarded thus taking the place of the land, the relation of landlord and tenant is extin-

guished, and all covenants growing out of that relation are
necessarily at an end." JUDGE SHARSWOOD, after announcing
the above doctrine, added "We believe the rule for the meas-
ure of damages, when lessor and lessee have claimed compen-
sation for land taken for public use, has always been in this
State that which we have herein propounded." It will there-
fore be seen that although that Court fully recognized the
common law rules governing the relation of landlord and ten-
ant, yet, even in a case of a lease for five years, when all of
the lot that was useful to the tenant was taken by condemna-
tion, and the landlord was deprived of recourse to the land
and thrown upon the personal responsibility of the tenant, the
money awarded to the tenant to meet the payments of rent *in
futuro in equity* belonged to the lessor. The Court further
said "If a chancellor would regard the damages awarded to
the tenant to indemnify him against his covenant to pay rent,
as in equity the money of the landlord and decree it to be paid
to him, a jury of view to assess damages ought at once to
award it to him." The Court cited with approval the two
cases which we will next refer to. In *Voegtly* v. *P. & F. W.
R. R. Co.*, 2 Grant, 243, there was a perpetual lease and a
railroad company condemned a part of the land, but the
owner of the ground rent was not a party to the proceeding.
The viewers fixed the value of the land appropriated and made
it subject to a ground rent of $180 per annum, being part of
that reserved on the whole property, which was to be assumed
by the corporation condemning, it being capitalized at $3,000.
The damages were paid to the lessee. The reversioner filed
a bill to restrain the railroad company from using the road
until said sum of $3,000 was paid, and asked the Court to de-
cree an apportionment of the principal of the ground rent.
The Court refused the relief because the proceedings were not
against him, and he was not affected by anything that was
done, but in the opinion it was said "A ground rent; being a
rent service, and not a rent charge, is undoubtedly appor tion-
able and may be partially released without extinguishing the
whole; and if part of the ground be taken for public use of a

highway, equity will apportion the rent, *in relief of the tenant*, compensating the ground landlord out of the damages awarded." *Cuthbert* v. *Kuhn*, 3 Whart. 357, the other case mentioned by JUDGE SHARSWOOD, also involved a ground rent. There a street was condemned over *part of a lot* in the city of Philadelphia and damages were awarded to the landlord and tenant respectively. The tenant filed a bill in equity for an apportionment of the ground rent. *It was conceded that the residue of the lot would be sufficient for the entire rent* but it was held that the ground rent was apportioned by the opening of the street, and that the rent was reduced in proportion to the amount of the lot taken for the public use. CHIEF JUSTICE GIBSON said "In proportion as the enjoyment is curtailed without the tenant's default, so is the rent to be; and as by the contract, which could be remodeled only by common consent, every part of the rent is to issue out every part of the ground, the landlord could not concentrate the whole of it on a particular part; and how can we treat the subject as if he might? * * * By the contract, however, the consideration of the rent is not to be money, but land, for which the tenant is not bound to accept an equivalent." A decree was passed that the complainant was entitled to an apportionment of the ground rent, and so much should be extinguished as would be in just proportion to the part of the lot taken. It directed a trial at law upon the issue; how much of the ground rent had become discharged by the opening of the street and what part should remain on the rest of the lot. In *Wirkman* v. *Mifflin*, 30 Pa. .St. (6 Casey) 362, it was said that a ground rent was not apportioned by taking part of the lot for a public highway. That was an action of covenant for the rent. *The tenant of the land had received its full value in damages*, and therefore neither in law nor equity was discharged from his personal covenant to pay the rent. JUSTICE SHARSWOOD said in *Dyer* v. *Wightman*, that that case did not in any way overrule *Cuthbert* v. *Kuhn*, which he fully adopted and relied on. It may be said that in *Dyer* v. *Wightman* the whole lot was aken, but in a later case (*Uhler* v. *Cowan*, 192 Pa. St. 443)

that Court said *there was no distinction by reason of the fact that only part was taken.*   In *Barclay* v. *Picker*, 38 Mo. 143, the Court held that a lease became void by a condemnation and rent could not be recovered.   See also *Board* v. *Johnson*, 66 Miss. 248; *David* v. *Beelman*, 5 La. An. 545; *Gillespie* v. *Thomas*, 15 Wendell, 464; *Corrigan* v. *Chicago*, 144 Ill. 537; *Mills on Eminent Domain*, sec. 69.   In *Lewis on Eminent Domain* (2 ed.), sec. 483, that author cites a number of cases on each side of the question (including Gluck's case as against the doctrine), and states that "undoubtedly the conclusion which is practically the most satisfactory, and which can be applied with the least injury to the parties is that the taking operates to extinguish the obligation to pay rent, in whole or in part, as the case may be.   Under the opposite rule there is handed over to the tenant a portion of the damages which is the equivalent of the rent to be paid, and the landlord may lose his rent by the insolvency of the tenant or otherwise, or be put to a suit in equity to have the fund impounded for his benefit."   Again he says "While the taking of the premises for public use is not a destruction of land in the literal sense, it is a destruction of the right and title of the parties in and to the land; while it is not an eviction by paramount title it is an eviction by paramount right.   A very slight modification or extension of the rules referred to will be sufficient to make them embrace the case of a taking for public use."

Without meaning to in any way question the conclusion reached in the Gluck case, or now to adopt the principles established in some of the authorities above cited which we declined to follow in that case, we cannot extend the doctrine there announced to a case such as this.   In the first place while neither the report of the case nor the record shows the exact amount taken from Gluck, it is apparent it was relatively a small portion of the whole lot, which was about 90 feet deep, while in this case nearly three-fourths of the lot was taken.   That will injuriously affect the lot very materially, for it does not require evidence to show that the uses of a lot 28x33 feet must be very much limited, as compared with those

of one 28x123 feet. Even in States where the Courts have held that rent cannot be apportioned, when a part of a lot is taken, it is generally decided that the taking under the power of eminent domain of the whole lot extinguishes the rent, and lessor and lessee must be paid for their respective interests. *Corrigan* v. *Chicago*, 144 Ill. 537, cited in Gluck's case, so holds, although in that State an apportionment for a part taken is not allowed, and *Foote* v. *City of Cincinnati*, 11 Ohio, 408, is there referred to as the only case cited to show that the rent is not extinguished when the whole lot is condemned. In *O'Brien* v. *Ball*, 119 Mass. 28, the same doctrine is announced, while in other cases in that State apportionment, when part was taken, was denied. So in *Taylor's Landlord and Tenant*, sec. 519, the same view is taken, while in *Wood's Landlord and Tenant* (2 ed.), 1098, it is said that to constitute an eviction "The act complained of must proceed from the landlord himself, or some person acting under his authority, or by or through him, *or from the exercise of some legal right by State or municipal authorities*, and must be such as deprives the tenant of the beneficial enjoyment° *of the whole or a part* of the premises." It was said in *Board* v. *Johnson, supra*, "It is difficult to perceive how the quantity of the estate taken can vary the relations of the parties, since in the one case, as the other, the act is the act of the State." If, however, the part taken be so small in proportion to the whole, as not to materially affect the use of the property, which could be made of it in its entirety, then all that the lessee and lessor can reasonably ask is compensation for that taken. If a tenant rents a farm of one hundred acres for a term of years, and a railroad company condemns a few acres for a right of way, there is no urgent reason for extinguishing the lease, or apportioning the rent, and the damages sustained by lessor and lessee can be readily determined and compensation paid. So, as in the Gluck case, if one rents for a limited term a house and lot in a city, and a small portion is taken, and the remainder can still be used for the purposes originally intended by the tenant, all that he can reasonably demand is to be compensated

for his damages and there is no necessity or occasion for the law to further interfere with the lease. But if a lot is leased that is well adapted to the purposes of an ordinary sized store, an office building or some such use, it would work great injustice to the tenant to take three-fourths of it for the public use, and require him to pay the same rent that he formerly had paid. If the rent corresponded with the present value of the property it would in many cases be a prohibition on his selling the remaining lot, as no one would buy it and subtenants would hesitate to occupy it. It is no answer to say that it is shown that the remaining lot in this case is ample security for the rent, for if it be a legal principle, which cannot be departed from, that an apportionment of rent cannot be allowed when part of leasehold property is condemned, what difference does it make that the residue is still sufficient to secure the rent? If it be admitted that it can be apportioned in some cases, that establishes the fact that the rule is not without its exceptions, and we think this is one, because the amount taken from this lot is such as to radically change the uses that can properly be made of it and nothing short of an apportionment can do full justice to all persons concerned.

But there is an additional and still stronger reason which shows that this is not the character of case that the general rule, announced in the Gluck case, should be applied to. We have already referred to some of the qualities of a lease of this kind. Unlike ordinary leases referred to in the authorities establishing the general doctrine, the leasehold interest is frequently, not to say usually, by far the most valuable of the two interests in such perpetual leases, as are peculiar to this State (with the possible exception of Pennsylvania). The leaseholder, as we have said, is the substantial owner of the property. All that the owner of the ground rent is concerned about is that his rent is secure, and in the great majority of leases made years ago in Baltimore, it is secure whether the property is improved or not, as they were made when the value of the ground was much less than it is now. Some of the most valuable property in Baltimore is held by sub-leases.

A leased to B a large lot, B to C part of that, and C to D a part of that, and so on.   Some of the cases that have been before us from time to time show how confusing and injurious it may be to continue the whole of the original rent, when a part of the property originally leased is taken.   A ground rent is a rent service and hence not only can be apportioned, but will be so regarded, if the lessor accepts a surrender of part of an entire lot, *Ehrman* v. *Mayer*, 57 Md. 612, or if he grants part of the reversion, *Worthington* v. *Cooke*, 56 Md. 51, acquiescence by the owner of the reversion in the apportionment of the rent will sometimes be presumed although there is no record evidence of it, as shown in *Connaughton* v. *Bernard*, 84 Md. 577, *Barnitz* v. *Reddington*, 80 Md. 622, and other instances might be cited to show the tendency of this Court to sustain apportionments of rents when the circumstances permitted such a conclusion.   And when the State, or a municipality or other corporation authorized by the State, takes a part of a lot subject to such a lease as this, under the power of eminent domain, there is no reason why the rent should not be apportioned when the circumstances require that, in order to do full justice to all parties.

Certainly the reason assigned in the brief of the leaseholder cannot be sustained.   It is contended that it would impair the obligation of the contract made between lessor and lessee, but how can it have that effect, by paying the reversioner the value of his interest taken and correspondingly reducing the rent of the leaseholder, in addition to compensating him for his loss, any more than, if as much as, by requiring the leaseholder and his assigns to perpetually pay the same rent for one-fourth of the ground contracted for as he was required, by the contract, to pay for the whole.   In order to do justice to both, the original contract made by the lease must be affected in some way.  The reversioner can no longer have the security the lessor and lessee contracted he should have, the leaseholder can no longer have all the land the lease called for.  They never agreed that the rent should be "concentrated," to use the expression of CHIEF JUSTICE GIBSON, upon the rear

fourth of the lot. But some change is the necessary result of the exercise of the power of eminent domain reserved in the State for itself, or those upon whom it is authorized to bestow it. Every owner of property holds its subject to that higher right. The individual must yield to the public good and all he can ask or demand is that he be duly and fully compensated for his loss. We are of the opinion therefore that in this case the rent can and should be apportioned.

Under our system there is no reason why this cannot be done by the commission, jury, or whoever is authorized to award the damages, subject to the review of the Court, which can see that it is properly and fairly done. For, although the proceeding is not on the equity side of our Courts, when damages are to be awarded for property thus taken, regardless of the wishes of the owner, equitable principles can and should be applied. The effort should always be to place an owner of land in as favorable a position as he occupied before, so far as that can be done by the compensation to be awarded him. Our decisions show that although the jurisdiction conferred on our Courts in condemnation proceedings is special and limited, yet great latitude is given them to fully and properly dispose of all questions that are within that jurisdiction. The right to review and correct the award of damages and the assessment of benefits is expressly provided for by the statute now before us, and the Courts usually have such powers in this class of cases. There can therefore be no reason why they cannot apply equitable principles when the circumstances require it, in order to do full justice to the parties, as we are of the opinion they do in this case. It is not for us to determine whether amounts fixed by the Burnt District Commission are correct, but the method pursued by them was the proper one. We must therefore reverse the rulings of the Court below.

> *Rulings reversed and cause remanded for further proceedings in accordance with this opinion, the Mayor and City Council of Baltimore to pay the costs.*

(Decided June 22nd, 1905.)